[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-11901
_____

D.C. Docket No. 3:09-cv-11829-WGY-JBT

MARY SOWERS,
as personal representative of the Estate of Charles Sowers,

Plaintiff-Appellee
Cross-Appellant,

versus

R.J. REYNOLDS TOBACCO COMPANY,
individually and as successor by merger to the Brown and
Williamson Tobacco Corporation and The American
Tobacco Company,

Defendant-Appellant
Cross-Appellee,

PHILIP MORRIS USA, INC.,
et al.,

Defendants.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____
(September 15, 2020)

Before BRANCH, TJOFLAT, and ED CARNES, Circuit Judges.

ED CARNES, Circuit Judge:

Charles Sowers smoked one to three packs of cigarettes a day for about fifty years, and it killed him.  He died of lung cancer caused by smoking cigarettes. Mary Sowers, his widow and the representative of his estate, sued the manufacturer of the cigarettes, R.J. Reynolds, under Florida's wrongful death statute.  A jury found the company liable for his death and awarded compensatory damages, which resulted in a judgment of $2.125 million.

R.J. Reynolds has appealed, seeking a new trial on two grounds, one involving an evidentiary ruling and the other involving some statements Mrs. Sowers' attorney made in closing argument.  We find no merit in either ground. She has cross-appealed, seeking a new trial on the issue of punitive damages, which was not presented to the jury at the first trial.  R.J. Reynolds does not dispute that Mrs. Sowers is entitled to a new trial on punitive damages but contends that if there is one it will have to include the liability issue, which would put at risk all of the compensatory damages she was awarded in the first trial.  We disagree that the trial she is entitled to receive on the punitive damages issue will open up the liability and compensatory damages judgment that she has already obtained in the first trial.

2

And, as we will explain, unless it is successful in getting our judgment vacated or reversed, R.J. Reynolds will have to pay Mrs. Sowers the compensatory damages award, plus any applicable interest, promptly after our mandate issues instead of delaying payment until after the trial on punitive damages and any resulting appeal from the judgment in that trial is completed.

## I.  BACKGROUND: THE ENGLE CASE

This is an "Engle progeny" case, the name insiders give to the originating class action lawsuit with a lead plaintiff named Engle.  See Engle v. Liggett Group, Inc., 945 So. 2d 1246 (Fla. 2006).  In that case, a group of Florida smokers and smokers' survivors filed a class action against the major tobacco companies, including R.J. Reynolds, for injuries they suffered because of the tobacco companies' manufacture and sale of cigarettes containing nicotine.  See id. at 1256 & n.3.  The Engle class asserted numerous claims, including: (1) strict liability; (2) fraud; (3) conspiracy to commit fraud; (4) breach of implied warranty; (5) intentional infliction of emotional distress; (6) negligence; and (7) breach of express warranty; they also requested equitable relief.  See R.J. Reynolds Tobacco Co. v. Engle, 672 So. 2d 39, 40 (Fla. 3d DCA 1996).

After lengthy discovery and a year-long trial in the class action, the jury found, among other things, that the tobacco companies had breached their duty of care and sold defective cigarettes, and that their conduct satisfied the conduct

elements of the torts of fraudulent concealment, conspiracy to fraudulently conceal, breach of warranty, negligence, and strict liability.  See Engle, 945 So. 2d at 1255, 1276–77; see also Searcy v. R.J. Reynolds Tobacco Co., 902 F.3d 1342, 1346 (11th Cir. 2018) ("According to [the Florida Supreme Court], the Engle jury did not decide the defendants' liability, but instead 'decided issues related to [the defendants'] conduct.'") (first brackets added) (quoting Engle, 945 So. 2d at 1263). The Florida Supreme Court upheld the jury's findings and "decertified the class to allow individual actions about the remaining issues of specific causation, damages, and comparative fault."  Graham v. R.J. Reynolds Tobacco Co., 857 F.3d 1169, 1174 (11th Cir. 2017) (en banc) (citing Engle, 945 So. 2d 1246).

The Florida Supreme Court also clarified that some of the jury's findings "had preclusive effect in the later individual actions."  Id.; see also Engle, 945 So. 2d at 1277.

> Specifically, the Engle jury findings establish: (1) "that smoking cigarettes causes' various diseases, including 'lung cancer'"; (2) "that nicotine in cigarettes is addictive"; (3) "that the defendants placed cigarettes on the market that were defective and unreasonably dangerous"; (4) "that the defendants concealed or omitted material information not otherwise known or available knowing that the material was false or misleading or failed to disclose a material fact concerning the health effects or addictive nature of smoking cigarettes or both"; (5) "that the defendants agreed to conceal or omit information regarding the health effects of cigarettes or their addictive nature with the intention that smokers and the public would rely on this information to their detriment"; (6) "that all of the defendants sold or supplied cigarettes that were defective"; (7) "that all of the defendants sold or supplied cigarettes that, at the time of sale or supply, did not conform to

representations of fact made by said defendants"; and (8) "that all of the defendants were negligent."

Searcy, 902 F.3d at 1346 (quoting Engle, 945 So. 2d at 1276–77).  All members of the Engle class in their individual follow up trials are entitled to the benefit of those specific findings without having to prove them.

As a result, in his individual lawsuit an "Engle progeny" plaintiff who proves he is a member of the Engle class can use the findings of the Engle jury to establish the conduct elements for the torts of "strict liability, negligence, breach of express and implied warranty, fraudulent concealment, and conspiracy to fraudulently conceal claims."  Philip Morris USA, Inc. v. Douglas, 110 So. 3d 419, 436 (Fla. 2013).

What is left for each Engle progeny plaintiff to prove to prevail on an individual claim for negligence and strict liability (the two claims on which Mrs. Sowers succeeded) is: (1) membership in the Engle class, (2) individual causation, which is established by showing "that addiction to smoking the Engle defendants' cigarettes containing nicotine was a legal cause of the injuries alleged," and (3) damages.  Searcy, 902 F.3d at 1346 (quoting Douglas, 110 So. 3d at 430).  To prevail on individual claims for fraudulent concealment and conspiracy to fraudulently conceal (the two claims on which Mrs. Sowers did not succeed), Engle progeny plaintiffs must prove: (1) membership in the Engle class; (2) detrimental reliance on the material information that the Engle defendants had

5

concealed and conspired to conceal about the health effects and/or addictive nature

of smoking; (3) that the plaintiff's reliance was a legal cause of his injuries; and (4)

damages.  See Cote v. R.J. Reynolds Tobacco Co., 909 F.3d 1094, 1106 (11th Cir.

2018).

If an Engle progeny plaintiff who is a member of the class asserts in his

individual lawsuit a negligence claim, he is entitled to the benefit of the

Engle jury's finding that the tobacco company was negligent. But under Florida

law, in a negligence or strict liability action,  the company is entitled to assert the

affirmative defense of comparative fault and to use it to seek a reduction in an

award of compensatory damages on the ground that the injured person[1] contributed

to his own injuries.  See Fla. Stat. § 768.81(2) (stating that in a civil action for

damages based on certain claims, including negligence and strict liability,

"contributory fault chargeable to the claimant diminishes proportionately the

amount awarded as economic and noneconomic damages for an injury attributable

---

[1] We say "injured person" instead of "plaintiff" because the plaintiff in a Florida wrongful death action is the personal representative of the decedent's estate, seeking damages for the benefit of the estate itself and for the decedent's survivors.  See Fla. Stat. § 768.20.  Mrs. Sowers is both the estate's personal representative and a survivor.  As a result, she is both an "injured person" and the "plaintiff."  But that will not necessarily be true in every wrongful death case.  If the personal representative is not one of the decedent's survivors, she will not have suffered any injuries that are compensable under the Florida Wrongful Death Act.  See id. § 768.21.  And, of course, to the extent the representative seeks to recover damages on behalf of the decedent's estate, the injured person (the decedent) cannot be the plaintiff. The dead can't act as litigants any more than they can act as judges.  See Yovino v. Rizo, 139 S. Ct. 706, 710 (2019) (per curiam) (holding that dead judges cannot decide cases and explaining that "federal judges are appointed for life, not for eternity").

to the claimant's contributory fault, but does not bar recovery").  Comparative fault

does not apply to intentional tort actions.  Id. § 768.81(4).  So when an Engle

progeny case contains both negligence and intentional tort claims, if the plaintiff

prevails on an intentional tort claim, any compensatory damages award "may not

be reduced by comparative fault."  Schoeff v. R.J. Reynolds Tobacco Co., 232 So.

3d 294, 305 (Fla. 2017); see also Smith v. R.J. Reynolds Tobacco Co., 880 F.3d

1272, 1279 (11th Cir. 2018).

## II.  BACKGROUND: THIS CASE

Mrs. Sowers brought her Engle progeny claims in a wrongful death lawsuit

for losses she suffered when her husband, a lifelong smoker, died of lung cancer in

1995.  She asserted claims of fraudulent concealment, conspiracy to fraudulently

conceal, strict liability, negligence, gross negligence, and breach of both express

and implied warranty.[2]  Among other defenses, R.J. Reynolds asserted in its

answer that Mr. Sowers had contributed to his injuries, "barring [Mrs. Sowers']

recovery in whole or in part."

Before the case went to trial, Mrs. Sowers withdrew her claims for breach of

warranty.  Somewhere along the way her claim for gross negligence also dropped

out of the case.  Nothing about that claim was put to the jury.  The court did not

---

[2] Mrs. Sowers' complaint named three defendants: R.J. Reynolds, Philip Morris, and
Lorillard Tobacco Company.  Only R.J. Reynolds is relevant to this appeal because Lorillard was
dismissed from the case before trial and the jury found Philip Morris was not liable.

even mention the term "gross negligence" in its instructions, and the jury made no findings about gross negligence or the lack of it.

The only claims that went to the jury were: (1) negligence; (2) strict liability; (3) fraudulent concealment; and (4) conspiracy to fraudulently conceal.  As we have mentioned, the Florida Supreme Court's holding in Engle established for the jury in an Engle progeny lawsuit brought by a member of the class that the Engle defendants — which included R.J. Reynolds — had committed the conduct elements of each of those four torts.  See Douglas, 110 So. 3d at 436 (noting that Engle established "the Engle defendants' common liability for the strict liability, negligence, . . . fraudulent concealment, and conspiracy to fraudulently conceal claims").  After a seven-day trial, the jury returned a verdict in favor of Mrs. Sowers on the negligence and strict liability claims and found that she had sustained $4,250,000 in compensatory damages.

The issues the jury resolved in reaching those results are reflected in its answers to ten of the verdict form questions that the district court submitted to it. The substance of the jury's findings (this is a paraphrase) was:

### Class Membership

1) Charles Sowers was addicted to cigarettes containing nicotine.

2) Addiction to cigarettes containing nicotine was a legal cause of his death.

Negligence and Strict Liability

3) Smoking R.J. Reynolds' cigarettes was a legal cause of his lung cancer and death.

4) He and R.J. Reynolds were each 50% at fault as the legal cause of his lung cancer and death.

Fraudulent Concealment

5) He reasonably relied to his detriment on statements of R.J. Reynolds that concealed or omitted material information concerning the health effects and/or addictive nature of cigarette smoking.

6) His reliance on those statements was not a legal cause of his death.[3]

Conspiracy to Fraudulently Conceal

8) He reasonably relied to his detriment on statements R.J. Reynolds made in furtherance of its agreement to conceal or omit material information concerning the health effects and/or addictive nature of smoking.

9) His reliance on those statements was not a legal cause of his lung cancer and death.

Damages

10) The amount of compensatory damages sustained by Mrs. Sowers for the loss of her husband's companionship and protection, and

---

[3] The jury was instructed to skip question number seven if it answered "no" to question number six, which it did.

9

her mental pain and suffering as a result of his lung cancer and
death, was $4,250,000.

Because the jury did not find for Mrs. Sowers on her intentional tort claims, the

compensatory damages award was reduced by half based on the jury's

determination that Mr. Sowers was 50% at fault for his injuries, resulting in a

compensatory damages award of $2.125 million.  See Schoeff, 232 So. 3d at 305.

### III.  BACKGROUND: CHARLES AND MARY'S LIFE TOGETHER

At trial, the jury considered extensive evidence about the history of cigarette

design, use, and marketing in America.  Because little of that evidence is relevant

to the issues before us, we will skip most of it.  In this part of the opinion we will

discuss mostly facts about Mr. Sowers' life and his marriage to Mrs. Sowers that

were put before the jury, as well as some facts on that subject R.J. Reynolds was

not allowed to put before the jury.  These facts are relevant to the evidentiary

ruling that is an issue in the appeal.

Charles and Mary Sowers met in 1944 when he was in the Navy.  He was

nineteen, she was eighteen, and it was "love at first sight."  They married four

months later, had four children, and eventually settled in Florida.  After retiring

from the Navy, Charles worked as a parts salesman for trucking companies.

Charles was a heavy smoker when Mary met him, and he smoked between

one and three packs of cigarettes a day for most of his life.  Mary described him as

a "chain smoker," testifying that he "always had [a cigarette] in his hand," and the "first thing" he did every morning was smoke.  She described how he had "tried very hard to quit smoking" several times, but was never able to, and how he would get "jittery and nervous and seemed to have a lot of anxiety" whenever he tried to quit.  At some point, Charles went to a doctor "and talked about [how to quit smoking], but he still said he just couldn't give it up."  In 1994, after he was diagnosed with lung cancer, Charles was finally able to quit smoking with the help of nicotine gum.  But, of course, it was too late.  He died of lung cancer in 1995.

Charles had also been a heavy drinker for part of his life.  Mary testified that he was drinking heavily when they met and he continued doing so after they got married.  She said he would sometimes stop at a bar on the way to work and would also sometimes drink while at work.[4]  One of Mary's own experts testified that Charles "was universally characterized as someone who not only was a heavy drinker, but did not have control over that behavior, and, therefore, he was in trouble with alcohol."  The same expert also stated that Charles' drinking was "a major source of friction in his marriage" and agreed that it was a "clinically significant disruption" in his relationship with Mary.

---

[4] That testimony about Charles' drinking was contradicted by the testimony of his brother, William Sowers, who stated that Charles was only a "sociable drinker," didn't drink before work, and that he could never remember Charles drinking during work or on a lunch break.

The couple divorced in 1969 and Mary stated in her deposition it was because of Charles' "drinking and cheating." At the time they divorced, he was cheating on Mary with a woman named Louise. Soon after the divorce, Charles married a different woman (not Louise). He later divorced his second wife and he and Mary remarried in 1972. They remained married until Charles' death in 1995.

In 1979, several years after their remarriage, Charles and Mary attended a revival. When the preacher asked if anyone wanted to be saved, Charles — to Mary's surprise — stood up and went down to the altar. After the revival, Charles threw out all his alcohol and never drank again. He asked his doctor for help to quit drinking, and his doctor prescribed two medications: one to ease his withdrawal symptoms, and another to deter him from drinking by making him nauseated if he did. Charles also tried to quit smoking at that time, but he couldn't do it. Mary testified that after Charles "received Jesus as his savior, we had a good marriage. A good marriage."

### IV.  THE RULING ON THE MARITAL DISCORD EVIDENCE

Before trial, Mrs. Sowers moved to exclude testimony about her husband's infidelity and the couple's divorce and remarriage, arguing that evidence of it was both irrelevant under Federal Rule of Evidence 402 and unduly prejudicial under Rule 403. R.J. Reynolds argued that the evidence was relevant to damages, addiction, and causation, and was necessary to rebut Mrs. Sowers' testimony about

the length of the marriage and how long Mr. Sowers had smoked.[5]  The district court granted Mrs. Sowers' motion to exclude, ruling that the marital-discord evidence was not relevant because it had occurred so long ago.  The court also found that because the evidence would cast Mr. Sowers in a bad light it would be unfairly prejudicial under Rule 403.

We review evidentiary rulings only for an abuse of discretion.  Aycock v. R.J. Reynolds Tobacco Co., 769 F.3d 1063, 1068 (11th Cir. 2014).  "A district court abuses its discretion if it 'applies an incorrect legal standard, applies the law in an unreasonable or incorrect manner, follows improper procedures in making a determination, or makes findings of fact that are clearly erroneous.'"  Id. (quoting Brown v. Ala. Dep't of Transp., 597 F.3d 1160, 1173 (11th Cir. 2010)).  A clear error of judgment is also an abuse of discretion, United States v. Brown, 415 F.3d 1257, 1266 (11th Cir. 2005), but we "recognize a significant range of choice for the district court on evidentiary issues" and "defer to its decisions to a considerable extent," id. at 1265.

Under the Federal Rules of Evidence, relevant evidence may be excluded only "if its probative value is substantially outweighed by a danger of one or more

---

[5] Mrs. Sowers argues that R.J. Reynolds forfeited its arguments that the marital-discord evidence was relevant to addiction and causation because it didn't make those arguments in pretrial briefing.  Because we conclude that the district court did not abuse its discretion in excluding the evidence, we need not address that argument.

of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Courts should strike the balance "in favor of admissibility," and "look at the evidence in a light most favorable to admission, maximizing its probative value and minimizing its undue prejudicial impact." Aycock, 769 F.3d at 1069 (quotation marks omitted). The more essential evidence is to a party's case, the more probative it is, which means that duplicative testimony that simply "bolster[s] a party's case is more easily excluded under Rule 403" than testimony about issues the jury doesn't hear about some other way. Id.

R.J. Reynolds argues that the marital-discord evidence was relevant for four reasons. First, it argues that the evidence would have informed the jury's non-economic damages determination because "[a] jury cannot assess the spouse's 'loss' of companionship, or her 'mental pain and suffering,' without 'an honest and accurate picture of the marriage relationship between the decedent and the surviving spouse.'"[6] Second, R.J. Reynolds argues that the marital-discord

---

[6] In support of its argument, R.J. Reynolds relies heavily on our decision in Aycock v. R.J. Reynolds Tobacco Co., 769 F.3d 1063 (11th Cir. 2014), and a Florida District Court of Appeal's opinion in Adkins v. Seaboard Coast Line R.R., 351 So. 2d 1088 (Fla. 2d DCA 1977). But Aycock and Adkins have different timelines than does this case, and the difference matters. In both of those cases the improperly excluded evidence showed that the marriages were being harmed by the husband's actions near the time he died. See Aycock, 769 F.3d at 1066, 1071; Adkins, 351 So. 2d at 1092. But in this case, R.J. Reynolds wanted to present evidence of marital discord that occurred twenty years before Mr. Sowers' death. That is a significant enough difference to mean that neither Aycock nor Adkins controls.

evidence would have given the jury a more accurate understanding of the extent of Mr. Sowers' alcohol addiction, which he overcame, and showing that he also could have overcome his nicotine addiction if he had wanted to do so.  Third, R.J. Reynolds argues that the evidence was necessary to give the jury the full story about the Sowers' marriage and prevent the jury from having the false impression that they had been continuously and happily married from 1944 until 1995.[7]  Even if the marital-discord evidence were relevant to each of those topics, the district court did not abuse its discretion in concluding that the evidence's probative value was substantially outweighed by the risk it would unfairly prejudice Mrs. Sowers.  Especially since it would have been duplicative of other evidence on the topics for which R.J. Reynolds contends it was relevant.

The jury heard evidence about the extent of Mr. Sowers' alcohol abuse and its negative impact on his marriage.  It heard that he was a heavy drinker in the 1940s, 50s, 60s, and 70s.  It heard that he drank in the morning and throughout the

---

[7] R.J. Reynolds' fourth argument is that the marital-discord evidence should have been admitted to rebut Mrs. Sowers' testimony that her husband smoked "every day."  Its theory is that Mr. Sowers might have taken a break from smoking during their three-year divorce that she would not have known about.  But R.J. Reynolds provides no evidence to support the idea that Mr. Sowers stopped smoking during those three years, only hope-driven conjecture.  Conjecture is not enough to show that the district court abused its discretion in excluding the evidence.  Cf. Yellow Pages Photos, Inc. v. Ziplocal, LP, 795 F.3d 1255, 1276 (11th Cir. 2015) (holding that the district court did not abuse its discretion in excluding "testimony [which] was pure speculation, and thus too attenuated to be relevant").  That is especially so in the present case because other witnesses who knew him during those three years, including his brother, testified that Mr. Sowers had "smoked all of his life."

day, and that he sometimes stayed out all night drinking.  And it heard that his

drinking caused "significant friction in his marriage" and was a "clinically

significant disruption" in his life.  All the evidence of Mr. Sowers' alcohol use and

marital problems that the jury <u>did</u> hear means that evidence of the Sowers' divorce

and remarriage more than two decades before his death would have been

duplicative and cumulative, which diminishes any probative value it would have

had.

R.J. Reynolds argued extensively in closing that Mr. Sowers' ability to quit

drinking means he could have quit smoking if he had wanted to, which of course

undermines its argument that the evidence of marital-discord and three-year

divorce was necessary to make that same point.  For example, R.J. Reynolds

argued to the jury that:

> He threw away his alcohol, but he did not throw away his cigarettes.
> He went to his doctor for help to quit drinking.  He did not go to his
> doctor for help to quit smoking.  He used medicine to stop drinking.
> He didn't use any kind of medicine to try to quit smoking.  He wanted
> to quit drinking.  He was committed to stopping drinking.
>
> . . . .
>
> He took action when he became motivated to quit drinking, he did not
> take action to try to quit smoking, and that's because he didn't want to
> quit.  He enjoyed his smoking.  That's what he wanted to do. And
> that's fine.  But he can't come to court and get money for that.

Evidence that Mr. Sowers' heavy drinking contributed to the deterioration of his marriage was not necessary for R.J. Reynolds to draw comparisons between his alcohol use and his smoking.

Of course, evidence of the Sowers' marital discord, though far in the couple's past and more than 20 years before he died, might have affected to some extent how the jury viewed Mrs. Sowers' testimony about her husband. And it might have given the jury a fuller understanding of the couple's many years of life together. But that does not mean that the probative value of the evidence outweighed its prejudicial impact. The evidence the jury did hear about Mr. Sowers' long history of alcohol abuse and how it harmed the marriage diminished the probative value that the excluded evidence of the couple's temporary and long ago "unmarriage" might have otherwise had. "[W]hat counts as the Rule 403 'probative value' of an item of evidence, as distinct from its Rule 401 'relevance,' may be calculated by comparing evidentiary alternatives." Old Chief v. United States, 519 U.S. 172, 184 (1997). And the danger that the evidence would cause "unfair prejudice" within the meaning of Rule 403 is obvious. The court's ruling is within the range of discretion district courts are allowed in evidentiary matters.

## V.  THE CLOSING ARGUMENT ISSUES

After trial, R.J. Reynolds moved for a new trial or remittitur, arguing, among other things, that Mrs. Sowers' attorney had made improper statements during

closing arguments that affected the jury's damages determination. The district court denied the motion, finding that the statements were not improper.

We review only for abuse of discretion a district court's rulings about statements of counsel during closing argument. Goldsmith v. Bagby Elevator Co., Inc., 513 F.3d 1261, 1275 (11th Cir. 2008). Arguing that it is reprehensible for the defendant you are suing to defend itself "serves no proper purpose" and can sometimes be the basis for a new trial. Whittenburg v. Werner Enters. Inc., 561 F.3d 1122, 1130 (10th Cir. 2009) (collecting cases). But remarks made during closing argument will justify granting a new trial or reversing a judgment only if they are "plainly unwarranted and clearly injurious." Cote v. R.J. Reynolds Tobacco Co., 909 F.3d 1094, 1104 (11th Cir. 2018) (quotation marks omitted). In deciding closing argument issues on appeal, we consider "the entire argument, the context of the remarks, the objection raised, and [any] curative instruction." Id. at 1103 (quotation marks omitted).

R.J. Reynolds complains of the following comments that Mrs. Sowers' attorney made during his rebuttal closing argument:

> MR. HEIMANN [Counsel for Mrs. Sowers]: And I will say to you once again, doesn't it — isn't it obvious that if Mr. Sowers had not been addicted, had not been under the compulsion of addiction to smoke cigarettes, that he would have quit? Wouldn't any intelligent human being knowing what we know about and what — I said this before, we're not saying that he was ignorant by any means of the fact that there was a serious issue at the very least about smoking and health, wouldn't any intelligent human being quit if they were not actually addicted?

What you really have at work in this courtroom in terms of the defense is hypocrisy at work.

MS. PARKER [Counsel for R.J. Reynolds]:  Your Honor, objection. Your Honor's ruling on our bench brief.

THE COURT:  Overruled.

MR. HEIMANN:  For 50 years and more —

MS. PARKER:  Your Honor, objection then.  There is a pretrial order on continuing issue — on the continuing issue.

MR. HEIMANN:  I'm talking about when the events took place at the time, not today.

THE COURT:  Proceed.

MR. HEIMANN:  50 years and more these tobacco companies did everything they could to sustain smoking in this country by creating doubt and controversy where there should have been no doubt and where there should have been no controversy, by denying that there was proof of a causal link when they knew that there was, by insisting that more research was necessary, when they knew that the fact that lung cancer and other diseases were caused by smoking was a factor.  50 years and more that was their message to Americans.  Now they come into court, now they come into court —

MS. PARKER:  Your Honor, objection.  We are now into that pretrial order.

THE COURT:  I'm going to let him proceed and — overruled.

MR. HEIMANN:  Now they come into court and their defense is Mr. Sowers should have known, that everybody should have known what they, the tobacco companies, denied all that time.  And, in fact, they even go so far as to tell you that the public health authorities are responsible, at least in large part, because they recommended filtered cigarettes and low tar cigarettes.  And what was the fact about that? Dr. Burns testified about that in detail.  The truth of the matter is the tobacco companies knew what the public health authorities and what Reader's Digest and Consumer Reports didn't know, and they concealed what

19

they knew about the fact that filters were not safer and about the fact that their low tar cigarettes were not safer.  The public health authorities were wrong.

R.J. Reynolds argues that these statements improperly criticized it for defending itself.  It interprets the statements as suggesting "that Reynolds was doing something wrong — hypocritical — by defending against charges that it caused Mr. Sowers to smoke, or denying that it bore all the responsibility for his smoking."  And it asserts that the jury's "very high award" for non-economic damages demonstrates that the jury was prejudiced by the statements.

Mrs. Sowers responds that, viewing her attorney's statements in the context of the closing arguments as a whole makes clear that he was criticizing the substance of R.J. Reynolds' defense, not the fact of it.  Specifically, she asserts that her counsel was merely responding to arguments R.J. Reynolds made in its closing argument.  She is right.  Every defendant has a right to present a defense, but not to prevent the plaintiff from replying to it. To the defense that Mr. Sowers should have known, and must have known, how dangerous smoking was, a fair reply is that he might have known better if R. J. Reynolds had not been so deceitful about the dangers of smoking for so long.  Mrs. Sowers' attorney didn't attack R.J. Reynolds for putting forward a defense, he attacked the substance of the defense it put forward, replying to the arguments the company made in its closing argument.

R.J. Reynolds told the jury in its closing argument that "the real Mr. Sowers knew that smoking was bad for him, and knew that smoking could cause lung cancer."  It argued that Mr. Sowers "knew about all these health risks" associated with smoking.  It argued that Mr. Sowers may have thought filtered cigarettes were safer than regular ones because he "may very well have heard one of these news programs or this public service announcement or what was put out by the American Cancer Society."  And it argued that the jury didn't face "a situation where [Mr. Sowers] did not know [the health risks of smoking] because of a tobacco company."

Considering the context, the district court did not abuse its discretion in overruling the objections to the arguments of Mrs. Sowers' counsel.  See Cote, 909 F.3d at 1103 (stating that we consider, among other things, the context of the arguments to determine if they affected the jury's determination).  The context shows that Mrs. Sowers' counsel wasn't criticizing R.J. Reynolds' "hypocrisy" for merely defending against Mrs. Sowers' suit.  He was criticizing R.J. Reynolds' hypocrisy for arguing that Mr. Sowers should have known — or did know — something that R.J. Reynolds and other cigarette companies tried so hard to hide from the public: the health risks of smoking.  He wasn't criticizing R.J. Reynolds for merely "com[ing] into court"; he was criticizing R.J. Reynolds for spending "50 years and more . . . creating doubt and controversy" about the health risks of

smoking and <u>then</u> arguing in court that Mr. Sowers should have known about the health risks.  And he wasn't complaining about R.J. Reynolds having a "defense"; he was complaining about R.J. Reynolds having a defense "that everybody should have known what they, the tobacco companies, denied all that time."  It was a fair argument and he had a right to make it.

## VI.  PUNITIVE DAMAGES AND THE ISSUE ABOUT THE SCOPE OF THE TRIAL ON REMAND

### A. <u>The Error in Not Submitting the Punitive Damages Issue to the Jury</u>

Finally, we turn to Mrs. Sowers' cross-appeal on the issue of punitive damages.  The district court, relying on a decision by a Florida District Court of Appeal, ruled that she could seek punitive damages on her fraudulent concealment and conspiracy to fraudulently conceal claims, if she prevailed on those two claims, but it turned out she did not.  <u>See</u> <u>In re Engle Cases</u>, No. 3:09-CV-10000-J-32JBT, 2013 WL 12157846, at *3 (M.D. Fla. Mar. 1, 2013) (opinion in the master case) (citing <u>Soffer v. R.J. Reynolds Tobacco Co.</u>, 106 So.3d 456, 460–61 (Fla. 1st DCA 2012)).  Relying on the same District Court of Appeal decision, the district court also ruled that Mrs. Sowers could not seek punitive damages on the negligence and strict liability claims, which it turned out she did prevail on. <u>Id.</u> The net result was that the jury never considered whether to award Mrs. Sowers punitive damages.

After the trial in this case was over, however, the Florida Supreme Court reversed the District Court of Appeal's decision that the district court had relied on and held that <u>Engle</u>-progeny plaintiffs, like Mrs. Sowers, could pursue punitive damages on "all claims properly raised in their subsequent individual actions." <u>Soffer v. R.J. Reynolds Tobacco Co.</u>, 187 So. 3d 1219, 1221 (Fla. 2016). Assuming, of course, they prevailed on some claims in their individual actions. Negligence and strict liability are "claims properly raised" in Mrs. Sowers' individual action (her trial and this appeal), and she did prevail on them. So Mrs. Sowers should have been allowed to seek punitive damages on her negligence and strict liability claims and it was error for the district court not to allow her to do so, although the error stemmed from the court following what was the law at that time.

Mrs. Sowers is entitled to have that error corrected by a remand for purposes of a trial on the issue of whether she should receive punitive damages on the negligence and strict liability claims and, if so, how much. No one disputes that she is entitled to a trial for that purpose.

### B. The Issue Involving the Scope of the Trial on Remand

The dispute is about whether the trial on remand can be limited to punitive damages, as Mrs. Sowers contends, or must be a complete re-do of all of the liability issues as well, which is R.J. Reynolds' position. She doesn't want to have to put her hard won liability and compensatory damages judgment at risk as the

cost for seeking punitive damages in a new trial.  But that is exactly the cost that R.J. Reynolds wants us to charge Mrs. Sowers for seeking punitive damages from it in a new trial.

Actually, what the company wants to do is pressure the elderly widow, whose husband its products killed, out of exercising her right to seek punitive damages from it for that.  The amount of pressure that strategy employs is shown by the fact that Mrs. Sowers has stated through her attorneys that if she is forced to retry the liability and compensatory damages issues as the cost of seeking punitive damages, she will forsake her right to seek them.  Reply Br. at 15.  If the law permits R.J. Reynolds to force that difficult choice on her, so be it.  See 28 U.S.C. § 453 (requiring each federal judge to solemnly swear or affirm to "administer justice without respect to persons, and do equal right to the poor and to the rich" and to "impartially discharge and perform all the duties incumbent upon [the judge] under the Constitution and laws of the United States.").  But we don't think that the Constitution or laws of the United States require putting Mrs. Sowers to that choice.[8]

---

[8] The Florida Supreme Court held that the proper remedy in a case in which a plaintiff had been erroneously prevented from seeking punitive damages on her negligence or strict liability claims is to remand for a trial limited to the issue of punitive damages.  Soffer v. R.J. Reynolds Tobacco Co., 187 So. 3d 1219, 1233–34 (Fla. 2016).  That is not the end of the matter here because we aren't a Florida state court, and we must consider the Seventh Amendment and its Reexamination Clause.  The Soffer decision had no need to do that because the Seventh Amendment "governs proceedings in federal court, but not in state court."  Gasperini v. Ctr. for

C.  <u>The Reexamination Clause and Decisions Applying It</u>

In arguing that a new trial on remand must wipe the slate clean of the

liability verdicts and compensatory damages award, requiring Mrs. Sowers to start

from scratch on those issues, R.J. Reynolds' points to the Seventh Amendment,

which states in full:

> In Suits at common law, where the value in controversy shall exceed
> twenty dollars, the right of trial by jury shall be preserved, and no fact
> tried by a jury, shall be otherwise re-examined in any Court of the
> United States, than according to the rules of the common law.

U.S. Const. Amend. VII.  The first clause has been called the "Jury Trial Clause,"

and the second the "'Reexamination' Clause."  <u>See, e.g.</u>, <u>Searcy</u>, 902 F.3d at 1354

(referring to the "Reexamination Clause"); <u>Full Spectrum Software, Inc. v. Forte

Automation Systems, Inc.</u>, 858 F.3d 666, 675 (1st Cir. 2017) (referring to the "Jury

Trial Clause").  Although the Seventh Amendment issue in this case involves only

the Reexamination Clause, the two clauses are inseparably linked and have been

since the beginning.

"[O]ne of the strongest objections originally taken against the [C]onstitution

of the United States[] was the want of an express provision securing the right of

trial by jury in civil cases."  <u>Colgrove v. Battin</u>, 413 U.S. 149, 152–53 (1973)

(quotation marks omitted).  In fact, a bill of rights was first proposed at the

---

Humanities, Inc., 518 U.S. 415, 418 (1996); <u>accord</u> <u>Osborn v. Haley</u>, 549 U.S. 225, 252 n.17
(2007) ("[T]he Seventh Amendment would not figure in the case, for it is inapplicable to
proceedings in state court.").

Philadelphia Constitutional Convention not in response to concerns about privacy or freedom of speech or freedom of the press, but because of concerns about the new Constitution not guaranteeing jury trials in civil cases.  See Charles W. Wolfram, The Constitutional History of the Seventh Amendment, 57 Minn. L. Rev. 639, 657–59 (1973); see also Lisa Litwiller, Has the Supreme Court Sounded the Death Knell for Jury Assessed Punitive Damages? A Critical Re-Examination of the American Jury, 36 U.S.F. L. Rev. 411, 418 (2002) (quoting Wolfram, supra, at 657); Roger Roots, The Rise and Fall of the American Jury, 8 Seton Hall Cir. Rev. 1, 2 (2011) ("Indeed, as Yale Law Professor Akhil Amar recounts, the entire debate at the Philadelphia convention over the necessity of a bill of rights 'was triggered when George Mason [mentioned] . . . that no provision was yet made for juries in civil cases.'") (quotation marks omitted) (quoting Akhil R. Amar, The Bill of Rights: Creation & Reconstruction, 83 (1998)); Edith Guild Henderson, The Background of the Seventh Amendment, 80 Harv. L. Rev. 289, 293 (1966).

The Anti-Federalists, who opposed the ratification of the Constitution, were not only upset that it did not guarantee the right to jury trials in civil cases but also concerned that it might even abolish civil jury trials.  Patrick Woolley, Mass Tort Litigation and the Seventh Amendment Reexamination Clause, 83 Iowa L. Rev. 499, 508 (1998).  That concern arose from Article III, Section 2 of the Constitution, which provides that "[i]n all the other Cases before mentioned, the

supreme Court shall have appellate Jurisdiction, both as to Law and Fact."  U.S.

Const. Art. III, § 2, cl. 2 (emphasis added). The Supreme Court's constitutional

authority to determine facts was especially troubling to the Anti-Federalists

because of a practice existing at the time in the New England States that "permitted

removal of a case after judgment for a retrial by jury in a superior court."

Woolley, supra, at 507.  The Constitution arguably authorized similar retrials of

jury trials in appellate courts.  Id. at 506–07.  "Indeed, because the original

Constitution did not have an express civil jury trial provision, Section 2 of the

Judicial Article could fairly be read as authorizing the Supreme Court to retry civil

cases without a jury."  Id. at 507.  Out of that political anxiety came the Seventh

Amendment.

At the time, the states "varied widely as to the cases in which civil jury trial

was provided," and there was no existing federal practice.  Colgrove, 413 U.S. at

153–55.  For that reason, the Seventh Amendment language ensuring the right to a

jury in civil cases "necessarily ha[d] to be general."  Id. at 155.  Which is why it

speaks generally of "suits at common law."  Id.  The  purpose of that language was

"to retain the common-law distinction between the province of the court and that of

the jury" and to ensure that "issues of law are to be resolved by the court and issues

of fact are to be determined by the jury under appropriate instructions by the

court."  Balt. & Carolina Line, Inc. v. Redman, 295 U.S. 654, 657 (1935).

The Supreme Court has recognized again and again that the scope of the jury trial right that the Seventh Amendment preserves is "the substance of the common-law right of trial by jury, as distinguished from mere matters of form or procedure." Id.; accord Colgrove, 413 U.S. at 156–57 (collecting cases); Galloway v. United States, 319 U.S. 372, 390 (1943) ("The Amendment did not bind the federal courts to the exact procedural incidents or details of jury trial according to the common law in 1791, any more than it tied them to the common-law system of pleading or the specific rules of evidence then prevailing."); Gasoline Prods. Co. v. Champlin Refining Co., 283 U.S. 494, 498 (1931) ("[T]he Seventh Amendment does not exact the retention of old forms of procedure.").  In line with the focus on substance instead of procedure, the Supreme Court has upheld against Seventh Amendment challenges "many procedural devices developed since 1791 that have diminished the civil jury's historic domain." Parklane Hosiery Co. v. Shore, 439 U.S. 322, 336 (1979).  The Court has held, for example, that a directed verdict does not violate the Seventh Amendment. Galloway, 319 U.S. at 388–96.  Nor does summary judgment. Fidelity & Deposit Co. of Md. v. United States, 187 U.S. 315, 319–21 (1902).

As we have mentioned, this appeal is concerned with the Reexamination Clause.  It might be more accurately described as the "Anti-Reexamination Clause" because it protects the flank of the Jury Trial Clause by forbidding

28

reexamination in any federal court of a "fact tried by a jury" other "than according to the rules of the common law."  U.S. Const. Amend. VII; see W. Russell Taber, The Reexamination Clause: Exploring Bifurcation in Mass Tort Litigation, 73 Def. Couns. J. 63, 69 (2006) ("Essential to [the jury trial] right was the complementary guarantee that the findings of that jury would not be overturned in a subsequent proceeding.  Accordingly, the Reexamination Clause protects the fundamental right to jury trial by prohibiting certain reexaminations of jury conclusions."). Justice Story was of the view that the Reexamination Clause was, if anything, "still more important" than the Jury Trial Clause. See 3 Joseph Story, Commentaries on the Constitution of the United States § 1764, at 646 (1833).

In the seminal Reexamination Clause decision, Gasoline Products Co. v. Champlin Refining Co., the Supreme Court interpreted and applied the Reexamination Clause in a breach of contract case in which "errors in the charge of the trial court with respect to the measure of damages on the counterclaim," which was also for breach of contract, required a new trial.  283 U.S. at 495–96. The question was whether the new trial could be limited to damages or also had to include the issue of liability, which had already been decided in the original trial. Id. at 495–97.  The court of appeals had ordered retrial on only the issue of damages.  Id. at 496. The Supreme Court reversed, concluding that confining the retrial to damages in that particular case would violate the Reexamination Clause.

Id. at 497.  In the course of explaining its conclusion, the Court set out the rule for when an issue may be separately re-tried before a new jury.

The Court acknowledged that "at common law there was no practice of setting aside a verdict in part," as the court of appeals had done in that case by ordering a retrial of the damages issue alone.  Id. at 497.  It quoted Lord Mansfield's description of the common law rule as requiring that, when a verdict is correct on one issue but erroneous on another, "[f]or form's sake, we must set aside the whole verdict."  Id. at 498.  The Court was not impressed, reasoning that: "we are not now concerned with the form of the ancient rule.  It is the Constitution which we are to interpret; and the Constitution is concerned, not with form, but with substance."  Id.  And the constitutional substance, the Court held, is that if a jury has reached a proper verdict "upon one issue of fact," the Seventh Amendment and its Reexamination Clause do "not compel a new trial of that issue even though another and separable issue must be tried again."  Id. at 499.  At least they don't necessarily require a new trial of the properly determined issue as well as the improperly determined one.

Separability is the key. The Supreme Court explained in Champlin Refining that the crucial determination for Reexamination Clause purposes is whether the issue on which a party seeks partial retrial is "separable" — that is, whether the issue is "so distinct and independent of the others . . . that it can be separately

30

tried."  Id.  The Court stated the rule: A partial new trial "may not properly be resorted to unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice."  Id. at 500.

Applying that rule, the Supreme Court found that the issues of liability and damages were not separable in the Champlin Refining case itself.  Id.  They were not because the facts underlying the liability issue that the first jury had decided were intertwined with those underlying the damages issue that the second jury would be deciding.  See id. at 499.  Any jury determining the amount of damages for a breach of contract would need to know the contract terms, the date of its formation, and the date of its breach.  Id.  In the course of deciding that there was liability, the first jury had already found those facts, although its specific findings were not revealed in the verdict.  See id. at 499–500.  The second jury could not decide damages without reexamining those same factual issues and making new findings.  Id. at 500.  That is why the Supreme Court concluded that the question of damages was "so interwoven with that of liability" that a partial retrial on the issue of damages could not be had without injustice and therefore would violate the Reexamination Clause.  Id. at 500–01.  A full retrial was required.  Id.

We have applied Champlin Refining's Reexamination Clause standard a number of times, usually affirming a district court's grant of a partial retrial of an

issue before a new jury or ordering one ourselves.  See, e.g., Overseas Private Inv.

Corp. v. Metro. Dade Cty., 47 F.3d 1111, 1113, 1116 (11th Cir. 1995) ("Because

the liability issues were properly and clearly decided by the jury, the remedy in this

instance is to remand the case to the district court for a new trial on the amount of

damages only."); Roboserve, Ltd. v. Tom's Foods, Inc., 940 F.2d 1441, 1447 (11th

Cir. 1991) (affirming district court's grant of new trial as to all claims in the

complaint but reinstating the jury verdict on the counterclaim since the

"counterclaim was severable from the rest of the case because the first jury could

decide the counterclaim as an independent issue, without reference to the . . . issues

raised by [the plaintiff's] complaint"); Burger King Corp. v. Mason, 710 F.2d

1480, 1487 (11th Cir. 1983) (affirming the district court's order of a partial new

trial because the record confirmed the separability of the "liability and damages

issues"); Mfg. Research Corp. v. Greenlee Tool Co., 693 F.2d 1037, 1041–42 (11th

Cir. 1982) (affirming the district court's grant of a new trial limited to the issue of

damages, even though some evidence from the first trial was repeated in the

second trial because "[t]he repetition of some of the liability evidence, necessary to

establish causation, did not render the trial unfair"); see also FIGA v. R.V.M.P.

Corp., 874 F.2d 1528, 1533–34 (11th Cir. 1989) (acknowledging that "the scope of

a new trial may be limited to a single issue when the issue as to which a new trial is

required is separate from all other issues and the error requiring a new trial does

not affect the determination of any other issue," but concluding that the issues of damages and liability "are so interwoven . . . that justice demands a retrial of these issues together") (quotation marks omitted); cf. Brown v. Electrolux Home Prods., Inc., 817 F.3d 1225, 1239 (11th Cir. 2016) (noting the "many tools" district courts may use "to decide individual damages" in a class action case, including "bifurcating liability and damage trials with the same or different juries") (quotation marks omitted) (emphasis added).

Two years ago we decided a Reexamination Clause issue in an Engle progeny case. See Searcy, 902 F.3d at 1354–58. The jury in Searcy was instructed that, if it found the plaintiff's relative (her mother) was a member of the Engle class, "it should rely on the Engle findings," and accept that the defendant tobacco companies had committed the conduct elements of the concealment torts, "as if the [Searcy] jury had found those facts itself." Id. at 1347. The jury was also instructed that the plaintiff could prevail on her fraudulent concealment and conspiracy to fraudulently conceal claims only if the jury found that "in deciding or continuing to smoke, [the plaintiff's mother had] relied on the particular misleading information disseminated by the particular defendant and that such

reliance caused harm." Id. The jury found for the plaintiff on those concealment claims and awarded punitive damages based on them.[9] See id.

The tobacco companies challenged that award, arguing on appeal that allowing the progeny jury to award punitive damages based on the Engle jury's finding of concealment "required the [progeny] jury to speculate as to what the specific conduct was that formed the basis of the Engle jury findings," violating the Reexamination Clause. Id. at 1354. The companies argued that, unlike awarding compensatory damages in an Engle-progeny case, which are based on "the actual, individual harm suffered by [that] Plaintiff as determined by the jury at her trial," awarding punitive damages requires that the progeny jury "reassess the Engle jury findings in order to decide whether to award any punitive damages, and, if so, how much." Id.

Applying the standard from Champlin Refining, we held that because the original Engle jury and the Searcy jury (an Engle progeny jury) had been asked to

---

[9] The original Engle class action jury awarded the class a lump-sum of $145 billion in punitive damages. See Engle, 945 So. 2d at 1257. The Florida Supreme Court vacated that award as excessive and premature, but it effectively allowed Engle-progeny plaintiffs to pursue punitive damages in their individual actions. See id. at 1269–70. We acknowledged in our Searcy decision, however, that the Florida Supreme Court did not "address any Seventh Amendment implications of its decision to have punitive damages questions reserved for the progeny trials." Searcy, 902 F.3d at 1356. After all, as we have already noted, the Seventh Amendment applies only in federal court. See n.7, supra.

resolve different factual issues, the Reexamination Clause had not been violated.[10]

Id. at 1358.  We described what the district court in Searcy had instructed the jury:

> [P]unitive damages were warranted only if the jury found by clear and convincing evidence that the fraudulent conduct by defendant causing [the decedent's] lung cancer death showed: "[1] reckless disregard of human life or the safety of the persons exposed to the effect of such conduct [2] an entire lack of care that the defendant must have been conscientiously indifferent to the consequences [3] an entire lack of care that the defendants must have wantonly or recklessly disregarded the safety and welfare of the public or [4] such reckless indifference to the rights of others as to be equivalent to an intentional violation of those rights."

Id. at 1357 (cleaned up) (bracketed numbers in original).  That instruction, we explained, focused the jury "on the conduct of Defendants that caused" the death of the plaintiff's mother.  Id.  The jury was not, as the defendant tobacco companies had argued, "asked to speculate about what the [original] Engle jury had found."  Id.  Instead, the Searcy jury was asked "merely to examine the evidence that had been presented before it at trial" and determine whether the defendants' conduct warranted "punishment . . . via additional damages."  Id.  We

---

[10] On the way to reaching that holding in Searcy, we made two assumptions in the tobacco companies' favor: that the Reexamination Clause applies to a punitive damages determination, and that it could, in some circumstances, be violated if a later jury decided only the punitive damages issue.  Searcy, 902 F.3d at 1357.  The Searcy plaintiff argued that the Seventh Amendment, including the Reexamination Clause, does not apply to a punitive damages determination because an award of punitive damages is not a finding of fact.  Id. at 1354; see Cooper Indus., Inc. v. Leatherman Tool Grp., Inc., 532 U.S. 424, 437 (2001) ("[T]he jury's award of punitive damages does not constitute a finding of 'fact.'").  We did not address that argument because we concluded that, even if the Seventh Amendment did apply, it was not violated.  Searcy, 902 F.3d at 1358.

35

held that allowing the Searcy jury to determine punitive damages based in part on the findings of the original Engle jury that the defendant tobacco companies had committed the conduct elements of the torts of fraudulent concealment and conspiracy to fraudulently conceal did not violate the Reexamination Clause. Id. at 1358; see also id. at 1346.

Our Searcy decision is instructive and informs our resolution of the Reexamination Clause issue in this case, but it is arguably distinguishable.  It involved the original Engle class action jury and a later individual action before an Engle progeny jury.  It did not involve two Engle progeny juries — an earlier one that had returned a verdict for an individual plaintiff on negligence and strict liability (with underlying findings of class membership, legal causation, and comparative fault), and a later one that would decide how much punitive damages, if any, that same plaintiff would recover.  Those are the circumstances that frame the Reexamination Clause issue in this case.

D. Applying the Reexamination Clause to this Case

R.J. Reynolds argues that under the Reexamination Clause rule, a full retrial is necessary if there is to be a trial on punitive damages because "[t]here is no way to litigate punitive damages without reexamining the first jury's findings concerning Reynolds' conduct, which inhere in its class membership, comparative-fault, and compensatory-damages verdicts."  Response and Reply Br. at 39.  Mrs.

Sowers argues that allowing a second jury to determine punitive damages alone will not violate the Reexamination Clause because "[p]unitive damages . . . concern <u>only</u> [R.J. Reynolds'] conduct," and the first jury, which tried the liability issues in this case, did not evaluate R.J. Reynolds' conduct to reach any of its findings.[11]  Reply Br. at 11.  Instead, she maintains, the jury in this case decided only four issues relevant to the Reexamination Clause issue in this appeal: (1) <u>Engle</u> class membership, (2) causation, (3) comparative fault, and (4) compensatory damages.  She puts it this way:  "[T]he jury found that Mr. Sowers was addicted to cigarettes containing nicotine; that his addiction, along with smoking cigarettes manufactured by R.J. Reynolds, caused his death; that he was 50% responsible for his injuries; and that his injuries amounted to $4,250,000."  Reply Br. at 3.

We turn now to a close look at whether the punitive damages issues to be tried before a new jury on remand are "so distinct and separable" from the issues decided by the first  jury "that a trial of [punitive damages] alone may be had without injustice," or instead are "so interwoven" that the punitive damages issues

---

[11] Mrs. Sowers also argues, as did the <u>Searcy</u> plaintiff, that "[p]unitive damages do not implicate the Reexamination Clause."  Reply Br. At 3.  As in <u>Searcy</u>, we need not resolve the issue here because even if the issue of punitive damages can implicate the Reexamination Clause, allowing a partial retrial on punitive damages alone in this particular case does not violate it.  <u>See Searcy</u>, 902 F.3d at 1357–58.

cannot be decided alone "without confusion and uncertainty, which would amount

to a denial of a fair trial."  Champlin Refining, 283 U.S. at 500.

1. The Factual Issues that the Remand Jury Will Be
Determining in Deciding the Punitive Damages Issues

We begin by examining the factual issues the remand jury will decide.

Under Florida law a plaintiff who proves that a defendant is liable under a theory

of negligence or strict liability is entitled to compensatory damages for her injuries.

But she is not entitled to punitive damages unless she proves, by clear and

convincing evidence, that the defendant's conduct also amounted to either

intentional misconduct or gross negligence.  Fla. Stat. § 768.72(2); see also Fla.

Std. Jury Instr. 503.1b(1).  "Intentional misconduct" occurs when "the defendant

had actual knowledge of the wrongfulness of the conduct and the high probability

that injury or damage to the claimant would result and, despite that knowledge,

intentionally pursued that course of conduct, resulting in injury or damage."  Fla.

Stat. § 768.72(2)(a); Fla. Std. Jury Instr. 503.1b(1);  see also Burkhart v. R.J.

Reynolds Tobacco Co., 884 F.3d 1068, 1083 (11th Cir. 2018) ("[T]he jury was

required to answer questions about [the defendants'] conduct — whether [they]

had actual knowledge of their wrongdoing and nevertheless intentionally pursued

the conduct in question — upon which punitive damages liability would depend.").

The alternative predicate for punitive damages, "gross negligence," occurs when

the defendant's conduct is "so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct."  Id. § 768.72(2)(b); Fla. Std. Jury Instr. 503.1b(1).

### 2. The Class Membership Findings

The jury instructions show that in deciding the class membership issue, the first jury did not, as R.J. Reynolds contends, answer any of the factual questions that the remand jury will have to answer before determining whether to award punitive damages.  The district court instructed the first jury that:  "In order to be a member of the Engle class, Mrs. Sowers must prove by a preponderance of the evidence that Mr. Sowers was addicted to cigarettes containing nicotine, and that such addiction was a legal cause of his death."  And it explained to the jury that: "Mr. Sowers's addiction to nicotine was a 'legal cause' of his death if Mrs. Sowers proves by a preponderance of the evidence that such addiction directly and in natural and continuous sequence produced or contributed substantially to producing his death, so it can reasonably be said that, but for his addiction, his death would not have occurred."

The first jury's class membership verdict found that Mr. Sowers was addicted to cigarettes and that his addiction was a legal cause of his death.  See Jury Verdict on Questions 1–2.  That made him a member of the Engle class, but it does not tell us whether R.J. Reynolds acted with "actual knowledge of the

39

wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct."  See Fla. Stat. § 768.72(2)(a).  Those are facts that the remand jury will have to find in order to award punitive damages based on intentional misconduct.  Nor do the first jury's findings that Mr. Sowers was addicted to cigarettes and it caused his death tell us whether R.J. Reynolds' conduct was "so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct."  See id. § 768.72(2)(b).  Those are facts that the remand jury will have to find in order to award punitive damages on the alternative predicate of gross negligence.

The class membership issues the first jury decided are "so distinct and separable" from the punitive damages issues that the remand jury will be deciding "that a trial of [the punitive damages issues] alone may be had without injustice." Champlin Refining, 283 U.S. at 500.  The issues are not "so interwoven" that the punitive damages issues cannot be tried separately "without confusion and uncertainty, which would amount to denial of a fair trial."  Id.  The remand jury will not have occasion to, and will not be permitted to, reexamine the findings that — to use R.J. Reynolds' term — "inhere" in the first jury's verdict on class membership.

### 3.  The Comparative Fault Findings

R.J. Reynolds also argues that "the question whether [Mrs. Sowers] is entitled to punitive damages . . . is intimately bound up with the question of comparative fault."  Response and Reply Br. at 36.  That's so, according to R.J. Reynolds, because: "[b]oth issues require a jury to make a finding not just on the existence of Reynolds's negligence, but also the extent and nature of the negligent conduct.  The only difference is that the comparative fault issue further requires the jury to compare Reynolds's negligent conduct to Mr. Sowers's own negligence."  Id.  That is how R.J. Reynolds sees it.  We see it differently.

To begin with, the first jury in this case was neither asked nor permitted to decide whether R.J. Reynolds committed the tort of negligence or to determine how negligent the company was.  Because of the Engle decision itself, once a plaintiff's class membership is established in an Engle progeny trial, the jury has to take as given — it is instructed to accept as an established fact — that the defendant in that progeny case has been negligent.  See Douglas, 110 So. 3d at 429–30 ("[T]he Second District misapplied our decision in Engle when it required a separate causation instruction and finding for the negligence claim. . . . [T]he Phase I jury already determined that the defendants' conduct subjects them to liability to Engle class members under this negligence theory.  Therefore,  . . . individual plaintiffs must establish (i) membership in the Engle class; (ii) individual causation, i.e., that addiction to smoking the Engle defendants'

cigarettes containing nicotine was a legal cause of the injuries alleged; and (iii) damages.").  The first jury in the present Engle progeny case was instructed in no uncertain terms that if it found Mr. Sowers was a member of the Engle class, it had to accept as proven a number of facts, including: "[t]hat all of the Engle defendants were negligent."  And soon after that the jury was again instructed: "One of the Engle findings was that the Defendants were negligent with respect to their manufacture and sale of cigarettes and, you must accept that determination." There were no factual issues about R.J. Reynolds' negligence left over from the original Engle decision for the first jury in this individual case to decide; negligence was already established as a matter of law for all class members in all Engle progeny trials, including this one.  And to the extent it is relevant to punitive damages, negligence will be established through the law of the case in the punitive damages trial on remand; the remand jury will be instructed to accept as a given that R.J. Reynolds was negligent.

The same is true of strict liability.  There were no factual issues about R.J. Reynolds' strict liability left over from the Engle class action case for the first jury in this individual case to decide.  Id. at 429.  Strict liability was already established as a matter of law for all class members in all Engle progeny trials who prove individual causation, meaning that addiction to the Engle defendants' cigarettes containing nicotine was a legal cause of the injuries alleged.  See id. ("[L]egal

causation for the strict liability claim was established by proving that addiction to the Engle defendants' cigarettes containing nicotine was a legal cause of the injuries alleged. When an Engle class member makes this showing, injury as a result of the Engle defendants' conduct is assumed based on the Phase I common liability findings."). And if it were relevant to punitive damages, strict liability would be established through the law of the case in the punitive damages trial on remand, and the remand jury would be instructed to accept it as given.

The first jury's comparative fault determination in this case did not require it to make any findings that are interwoven with any of the findings that the remand jury will have to make in reaching a punitive damages verdict. A close look at the Florida law on comparative fault and on punitive damages reveals that the two determinations do not overlap. They are separable.

Florida is a pure comparative fault jurisdiction. See Fla. Stat. § 768.81(2); Am. Home Assurance Co. v. Nat'l R.R. Passenger Corp., 908 So. 2d 459, 468 (Fla. 2005) (explaining that Florida "abolished contributory negligence in favor of the doctrine of comparative negligence"). That means, at least where the jury does not find for the plaintiff on any intentional tort, an Engle progeny plaintiff's compensatory damages award is reduced by a percentage equal to how much he was at fault for causing his own injury. See Fla. Stat. § 768.81(2); Schoeff, 232 So. 3d at 305 (holding that "when a jury finds for an Engle progeny plaintiff on

43

intentional tort claims, the plaintiff's award may not be reduced by comparative fault").

Comparative fault is an affirmative defense. Bongiorno v. Americorp, Inc., 159 So. 3d 1027, 1029 (Fla. 5th DCA 2015). To get its benefit, the defendant has to plead and prove that even though he may have caused the injury, the plaintiff also contributed to causing it. See Fla. Stat. § 768.81(3)(a)1–2 (requiring that "defendant must affirmatively plead the fault of a nonparty" and "must prove at trial, by a preponderance of the evidence, the fault of the nonparty"). In Florida cause is equated with fault, and fault is equated with liability or is a defense to it. Fabre v. Marin, 623 So. 2d 1182, 1185 (Fla. 1993). One whose conduct was entirely or partially the legal cause of an injury is entirely or partially at fault for that injury. See Drew v. Tenet St. Mary's, Inc., 46 So. 3d 1165, 1167 (Fla. 4th DCA 2010) (Contributory fault concerns "conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection.") (quotation marks omitted). Establishing comparative fault is akin to proving the elements of negligence against the plaintiff. See Borenstein v. Raskin, 401 So. 2d 884, 886 (Fla. 3d DCA 1981). The defense of comparative fault is focused entirely on whether, and to what extent, the *plaintiff's* conduct was a legal cause of his own injuries. It is not focused on how negligent the defendant was.

44

The instructions on comparative fault that the court gave the first jury reflect that.  Here are those instructions:

> If you find that Mrs. Sowers proved by a preponderance of the evidence that smoking cigarettes manufactured by R.J. Reynolds was a legal cause of Mr. Sowers's lung cancer and death, then you must consider, only with regard to Mrs. Sowers's negligence and strict liability claims, the extent to which Mr. Sowers's own conduct was also a legal cause of such injuries.  However, it is Defendants' burden to prove the degree to which Mr. Sowers was at fault by a preponderance of the evidence.

> Allocating a percentage of fault to Mr. Sowers will not necessarily prevent Mrs. Sowers from recovering compensatory damages on her negligence and strict liability claims; it will only reduce the amount that she may recover as to those two claims.  In other words, if you find that Mr. Sowers is, for example, 50% responsible for his own injuries, you would fill in that percentage as your finding on the verdict form.  Such a finding would not prevent Mrs. Sowers from recovering; the Court will prepare the judgment to be entered and will reduce Mrs. Sowers's total damages as required by law on those two claims.  Of course, by using the number 50% as an example, I do not mean to suggest to you any specific figure at all.  You might find 0% or 100%.

> After deciding the degree of fault to be allocated to Mr. Sowers, stated in terms of a percentage, you will then decide, based upon a preponderance of the evidence, the degree of fault to be assigned to R.J. Reynolds. The percentage you assign to R.J. Reynolds and Mr. Sowers must total 100%.

The first jury was not asked to examine R.J. Reynolds' conduct in order to measure the nature or extent of its negligence or strict liability, but instead it was asked to find the extent to which Mr. Sowers' own conduct was a legal cause of his injury.  And the jury was told to express Mr. Sowers' share of the fault as a percentage of the total fault or responsibility for the injury.  That would be his fault-based measure of responsibility for the injuries he suffered.  Once the jury determined that, it was to subtract his percentage of the fault from one hundred percent — simple math — in order to determine R.J. Reynolds' fault-based measure of responsibility for the injury Mr. Sowers had suffered.  The first jury followed its instructions and decided that R.J. Reynolds and Mr. Sowers were each fifty percent at fault.  If that comparative fault determination were relevant to the punitive damages determination that the remand jury will be making, it would be law of the case that each party was fifty percent at fault, and the remand jury would be instructed to take that as a given.  As a result, the remand jury would not have to reexamine any factual issues the first jury decided when it determined comparative fault.

But the remand jury will not be permitted, much less required, to consider comparative fault anyway.  The comparative fault issue is not interwoven with the punitive damages issue. The findings of the first jury about comparative fault don't

overlap with the findings the remand jury will have to make in deciding about punitive damages.  They are separable.

As for the intentional misconduct basis for punitive damages, the first jury's comparative fault instructions did not ask it to decide whether R.J. Reynolds "had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage."  See Fla. Stat. § 768.72(2)(a).  Instead, the instructions asked the first jury about Mr. Sowers' percentage of fault, and indirectly (through subtraction) about R.J. Reynolds' percentage of fault.  They did not ask whether R.J. Reynolds was guilty of intentional misconduct. That is a separate question left for the remand jury to answer.  See Burkhart v. R.J. Reynolds Tobacco Co., 884 F.3d 1068, 1083 (11th Cir. 2018) (noting that the jury is tasked with deciding punitive damages liability).

As for the gross negligence alternative basis for punitive damages, the first jury's comparative fault instructions did not ask it whether R.J. Reynolds' conduct was "so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct."  See Fla. Stat. § 768.72(2)(b).  That question is left for the remand jury to decide.

Comparative fault and punitive damages are distinctly different.  Fault is about responsibility for bringing about an injury; comparative fault is about how

much of the entire cause of the injury each party is responsible for.  Comparative

fault is an affirmative defense that can reduce the amount of compensatory

damages included in the judgment; it cannot reduce the amount of punitive

damages and has no application to them.  See Fla. Stand. Jury Instr. 401.22a

(noting that comparative fault as an affirmative defense); Fla. Standard Jury

Instruction 503.1c(2) (providing no mention of a claimant's comparative fault in

determining the amount of punitive damages).  Punitive damages are about

whether a defendant should be punished by being forced to pay more than the

amount necessary to compensate the plaintiff for the injury the defendant has

caused.  See Soffer, 187 So. 3d at 1222 ("The jury is instructed that, based on the

allegedly intentional misconduct or gross negligence, it must determine whether

punitive damages are warranted 'as punishment' against the defendant and 'as a

deterrent to others.'").  Compensatory damages are not designed to punish or to

deter.  Am. Cyanamid Co. v. Roy, 498 So. 2d 859, 861 (Fla. 1986) (Punitive

damages "are assessed in a dramatically different manner than compensatory

damages," and they are "based not on the plaintiff's actual damages but upon the

wealth of the defendant and the perceived need to punish and deter.").  Punitive

damages are focused entirely on the defendant and its conduct.  Compensatory

damages are not.

In summary, the findings underlying the first jury's comparative fault verdict are concerned solely with determining the amount of compensatory damages that will be awarded.  Those findings do not overlap with the punitive damages findings that the remand jury will be called on to make (about whether R.J. Reynolds engaged in intentional misconduct or was grossly negligent) in the course of deciding whether to punish R.J. Reynolds and attempt to deter others from similar conduct.  The issues are "so distinct and separable" that they may be tried separately "without injustice"; they are not "so interwoven" that they cannot be tried separately "without confusion and uncertainty, which would amount to denial of a fair trial."  Champlin Refining, 283 U.S. at 500.

### 4. The Compensatory Damages Determination

We have saved R.J. Reynolds' worst argument for last.  Bear in mind that the first jury was instructed that in determining the amount of compensatory damages it "should assess the amount you find to be justified by a preponderance of the evidence as full, just and reasonable compensation for all of the damages for Mr. Sowers's lung cancer and death, no more and no less."  And it was further instructed that: "Compensatory damages are not allowed as a punishment and must not be imposed or increased to penalize the Defendants."

Still, R.J. Reynolds contends that the amount of punitive damages that the remand jury will assess is intertwined with the first jury's compensatory damages

assessment because once the first jury found against Mrs. Sowers on the fraud

claims it knew that it could not award her any punitive damages.  The jury knew

that it couldn't because it had been told that based on the existing law at the time.

As a result, R.J. Reynolds speculates, conjectures, and assumes that the first jury in

this case "might have adjusted [its compensatory damages award] upward knowing

that [Mrs. Sowers] would receive no punitive damages."  Response and Reply Br.

at 39.  Even though the jury was emphatically instructed not to do so.

In other words, R.J. Reynolds thinks we ought to presume that the jurors in

the first trial violated their oath and flouted their instructions.  This is R.J.

Reynolds' worst argument because:

> We not only can, but we must, presume that juries follow their
> instructions.  The presumption that they do is rock solid law enshrined
> in a host of decisions of the Supreme Court and this Court.  See, e.g.,
> Kansas v. Carr, ⸺ U.S. ⸺, 136 S.Ct. 633, 645 (2016); Penry v.
> Johnson, 532 U.S. 782, 799 (2001); Weeks v. Angelone, 528 U.S. 225,
> 234 (2000); Richardson v. Marsh, 481 U.S. 200, 206–07 (1987)
> (referring to "the almost invariable assumption of the law that jurors
> follow their instructions, which we have applied in many varying
> contexts.") (citation omitted); Francis v. Franklin, 471 U.S. 307, 324
> n.9 (1985) (recognizing "the crucial assumption underlying our
> constitutional system of trial by jury that jurors carefully follow
> instructions"); United States v. Zitron, 810 F.3d 1253, 1255–58 (11th
> Cir. 2016); Greene v. Upton, 644 F.3d 1145, 1157 (11th Cir. 2011);
> Puiatti v. McNeil, 626 F.3d 1283, 1314–15 (11th Cir. 2010).

In re Price, 964 F.3d 1045, 1049 (11th Cir. 2020).  If bad arguments could blush, this

one would be radiantly red.

## VII.  IMMEDIATE PAYMENT OF THE COMPENSATORY
## DAMAGES AWARD AFTER THE MANDATE ISSUES

In the last paragraph of the last brief she filed in this appeal, Mrs. Sowers states that if we order the case remanded for a trial on the punitive damages issues alone, as we are doing, she "intends to enforce the compensatory damages judgment before the punitive damages retrial occurs." Reply Br. at 29.  We take that as a request that we direct the district court to order execution on the compensatory damages part of the judgment immediately after issuance of the mandate in this appeal.  We will.

Courts have done this sort of thing before.  See Dempsey By & Through Dempsey v. United States, 32 F.3d 1490, 1497–98 (11th Cir. 1994) (Carnes, J., concurring) (explaining why this Court had entered an immediate affirmance of the uncontested part of a monetary judgment in that case and ordered that amount paid then, instead of allowing it to go unpaid until the appeal of the contested part of the judgment was completed); Barnes v. United States, 678 F.2d 10, 11, 13 (3d Cir. 1982) (entering over the objection of the government a partial summary affirmance of the uncontested part of a FTCA damages judgment so the plaintiff could collect it before the appeal of the contested part was decided on appeal);  Carter v. United States, 333 F.3d 791, 793 (7th Cir. 2003) (recounting that it had entered a partial affirmance in the plaintiff's favor for the uncontested part of the judgment on appeal, even though her appeal of the district court's reduction in the amount of

another award had still been pending); King Instrument Corp. v. Otari Corp., 814 F.2d 1560, 1563 (Fed. Cir. 1987) (explaining that "[i]t was therefore not incorrect or an abuse of discretion for the trial judge to order execution on that portion of the judgment which was final" after having been affirmed on appeal, before disposing of the remaining issue that had been remanded to it).

And Congress has authorized federal courts of appeals to "remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances." 28 U.S.C. § 2106. This litigation, including the original class action, has been going on for a quarter of a century. When it began Mrs. Sowers was in her sixties. She is now in her mid-nineties. The part of the judgment we are affirming establishes that R.J. Reynolds owes Mrs. Sowers $2,125,000 for the injuries the company has caused her. It is "just under the circumstances" that R.J. Reynolds pay her what it owes her, and sooner rather than later.

When and if our decision affirming the compensatory damages part of the judgment of the district court becomes final, the district court on remand is directed to see that the compensatory damages award, plus any applicable interest or other amounts due because of the award, is paid forthwith after issuance of the mandate instead of being delayed until after disposition of the punitive damages issues.

## VIII.  CONCLUSION

The district court did not err in preventing R.J. Reynolds from presenting evidence of the Sowers' divorce and remarriage or in denying R.J. Reynolds a new trial based on arguments Mrs. Sowers' counsel made in closing.  We affirm the district court's judgment on compensatory damages.  And that judgment, plus any applicable interest and other amounts, must be paid expeditiously after the mandate issues in this appeal.

The district court did err, through no fault of its own, in denying Mrs. Sowers the opportunity to seek punitive damages on her negligence and strict liability claims.  We vacate that part of its judgment and remand for a trial limited to the punitive damages issue.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.**

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

September 15, 2020

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  18-11901-JJ
Case Style:  Mary Sowers v. R.J. Reynolds Tobacco Company, et al
District Court Docket No:  3:09-cv-11829-WGY-JBT

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause. Non-incarcerated pro se parties are permitted to use the ECF system by registering for an account at www.pacer.gov. Information and training materials related to electronic filing, are available at www.ca11.uscourts.gov.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, costs taxed against appellant R.J Reynolds Tobacco Company.

Please use the most recent version of the Bill of Costs form available on the court's website at www.ca11.uscourts.gov.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Tiffany A. Tucker, JJ at (404)335-6193.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6151

OPIN-1A Issuance of Opinion With Costs

| From: | ecf_help@ca11.uscourts.gov |
|---|---|
| To: | FLMD_EFILE_APPEALS |
| Subject: | 18-11901-JJ Mary Sowers v. R.J. Reynolds Tobacco Company, et al "Opinion Issued On the Courts own Motion Opinion" (3:09-cv-11829-WGY-JBT) |
| Date: | Tuesday, September 15, 2020 11:09:35 AM |

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing.**

**United States Court of Appeals for the Eleventh Circuit**

**Notice of Docket Activity**

The following transaction was filed on 09/15/2020

| **Case Name:** | Mary Sowers v. R.J. Reynolds Tobacco Company, et al |
|---|---|
| **Case Number:** | 18-11901 |
| **Document(s):** | Document(s) |

**Docket Text:**
Opinion issued by court as to Appellant-Cross Appellee R.J. Reynolds Tobacco Company. Decision: Affirmed in part, Reversed in part, and Remanded. Opinion type: Published. Opinion method: Signed. The opinion is also available through the Court's Opinions page at this link http://www.ca11.uscourts.gov/opinions.(18-11902X)

**Notice will be electronically mailed to:**

Jason Todd Burnette
Clerk - Middle District of Florida, Clerk of Court
Richard M. Heimann
Andrew R. Kaufman
Robert J. Nelson
Stephanie Ethel Parker

**Notice sent via US Mail to:**

Edward M. Carter
Jones Day
325 JOHN H MCCONNELL BLVD STE 600
COLUMBUS, OH 43215

The following document(s) are associated with this transaction:
**Document Description:** Opinion Issued
**Original Filename:** 201811901.pdf
**Electronic Document Stamp:**
[STAMP acecfStamp_ID=1160056652 [Date=09/15/2020] [FileNumber=9187617-0]
[29b8499cacd7fd83361e644d17809f0e932919dc6971af434f6bd3e54048e995ac98f5e40548821b2dc72a2e97a50a96cac3c82e3291c272653b6b5c721a40c6]]

**Document Description:** OPIN-1A Notice to Counsel/Parties
**Original Filename:** /opt/ACECF/live/forms/JeffreyPatch_1811901_9187617_OPIN-1AIssuanceofOpinionWithCosts_301.pdf
**Electronic Document Stamp:**
[STAMP acecfStamp_ID=1160056652 [Date=09/15/2020] [FileNumber=9187617-1]
[10dfda33d9ea0e85dd05acb59f9459ff5ddfb99644b385afdbe9337b7a59f57295da4e9e56a7fc19fa950c624384f2029fa6d5e768b85f9053eca763fbc623df]]
**Recipients:**

- Jason Todd Burnette
- Edward M. Carter
- Clerk - Middle District of Florida, Clerk of Court
- Richard M. Heimann
- Andrew R. Kaufman
- Robert J. Nelson
- Stephanie Ethel Parker